# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| RHONDA WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04 C 3582 |
| | ) | |
| GENERAL SECURITY SERVICES CORPORATION, | ) | Judge Ruben Castillo |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Rhonda Walker, sued her former employer, General Security Services Corporation ("GSSC"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq*. Ms. Walker alleges that GSSC's management retaliated against her because she publicly complained about its sexually discriminatory practices and ultimately terminated her because of her complaints and her gender. Currently before the Court is GSSC's motion for summary judgment (R. 42-1) and motion to strike Ms. Walker's affidavit and Rule 56.1 response (R. 53-1). Because Ms. Walker cannot establish a prima facie case of retaliation, we grant GSSC's motion for summary judgment in its entirety.

## RELEVANT FACTS[1]

On October 25, 2002, Ms. Walker began working for GSSC as an armed security officer. She was primarily assigned to work in the federal building located at 77 West Jackson Boulevard in Chicago, one of the buildings within GSSC's Chicago Loop contract with the federal government. Ms. Walker was a full time employee with GSSC and the Chicago Fire Department

---

[1] These facts are derived from the parties' statements of facts filed pursuant to Local Rule 56.1(b). Unless otherwise indicated, the facts included herein are undisputed.

("CFD"). (R.50, Pl.'s Resp. to Def.'s Facts at 8.) Guy D'or ("D'or") is GSSC's manager for its Loop contract and Robert Doble ("Doble") is the Captain. Doble is responsible for scheduling all of the guards on the Loop contract. Esperanza Alvarez ("Alvarez") is a Sergeant on the Loop contract, and D'or and Doble are in her chain of command.

## I. The June 21st Meeting and Subsequent Mis-schedulings

Ms. Walker's complaint stems from a meeting held on June 21, 2003 by GSSC to discuss the Building Security Officer ("BSO") program. To qualify for this program, officers must have either five years of military experience or two and a half years of civilian law enforcement experience. (R. 50, Pl.'s Resp. to Def.'s Facts at 4.) Ms. Walker did not qualify for this program, and a disproportionate number of its participants were men. (*Id.* at 4.) In this meeting, Ms. Walker expressed her belief that several of the BSO guards were not qualified and that the program discriminated against women who had far less military experience on average than men. (*Id.* at 4-5.) Ms. Walker further stated that women were being removed from the lobbies of other buildings and placed in the 77 West Jackson building, a building with no definitive plans for a BSO program. (R. 46, Def.'s App. to Mot. for Summ. J., Pl.'s Dep. at 59-61.)

At this point in the meeting, Ms. Walker made the following comment to management: "Why are the women — why have we all been placed in the 77 West Jackson building, which is now labeled the building of fuck-ups? As you look around this room, most of your fuck-ups are in your BSO uniforms...[she then precedes to list the transgressions of BSO officers]...we don't meet your criteria if that's what you're looking for." (*Id.* at 64.) Ms. Walker then pointed to a fellow officer, Antoine Pegues ("Pegues"), who was involved in the BSO program, stating, "as you look around the room, your — most of your fuck-ups are in BSO uniform. Antoine Pegues..."

(*Id.* at 65.) It is disputed between the parties how Pegues reacted to hearing his name in this context, whether he simply stood up or if he lunged at Ms. Walker and had to be restrained, as Ms. Walker alleges. (R. 50, Pl.'s Resp. to Def.'s Facts at 6.) It is undisputed, however, that Ms. Walker told Pegues, "You come across that table, your ass gonna limp back." (*Id.*)

The meeting quickly ended after the altercation between Pegues and Ms. Walker. Ms. Walker was not reprimanded by any of her supervisors nor did anyone comment on the events of the meeting. (*Id.* at 7.)

Ms. Walker alleges that Doble deliberately mis-scheduled her five times and ultimately terminated her in retaliation for the comments she made about GSSC's discriminatory practices at the June 21st meeting.[2] Doble created weekly schedules for the eighty-five guards on the Loop contract, based on the calendar availability submitted by each guard. Ms. Walker submitted her schedule from the CFD for the whole year.[3] (*Id.* at 8.) Immediately after receiving her schedule, Ms. Walker complained to Doble or other management about the conflicts for the weeks ending

---

[2] Ms. Walker also claims that she was retaliated against for filing an internal complaint of sexual harassment in January of 2003, which was allegedly followed by two mis-scheduling incidents. These incidents are not, however, part of the unlawful sex discrimination and retaliation claims for which relief is sought in this lawsuit. (R. 50, Pl.'s Resp. to Def.'s Facts at 9.) Ms. Walker alleges that for two instances of mis-scheduling for which relief is sought as a part of the instant lawsuit, Doble had a dual motivation behind his unlawful acts. For the week ending August 22nd, she claims that she was mis-scheduled in retaliation for complaining that Sergeant Mitchell (a female) had written her up, but failed to personally deliver the write-up. (*Id.* at 19.) For the the week ending September 19th, the mis-scheduling allegedly stemmed from a September 2, 2003 memo written by Ms. Walker in which she stated that she believed Doble was retaliating against her because of a response Ms. Walker wrote regarding the complaint from Sergeant Mitchell that Ms. Walker was creating a sexually hostile work environment. (*Id.* at 21.)

[3] There were two other employees, both male, who worked for the Chicago Fire Department on the same shift as Ms. Walker and had the same availability. While both employees worked fewer hours than Walker, it is disputed whether Doble ever mis-scheduled these individuals. (R. 50, Pl.'s Resp. to Def.'s Facts at 12-13.)

3

July 4, 2003, July 19, 2003, July 25, 2003, and August 22, 2003. (*Id.* at 11, 15.) Management responded by replacing Ms. Walker on the schedule with another employee after she was scheduled to work on days that conflicted with her job at the CFD. (R. 46, Def.'s Memo. in support of Summ. J. at 3 - 4; R. 50, Pl.'s Resp. to Def.'s Facts at 15-18.) For the weeks ending July 4, 2003, July 25, 2003, and August 22, 2003, Ms. Walker made up the hours that she lost because of the conflicting schedule. (R.50, Pl.'s Resp. to Def's Facts at 15-19.) For the week ending July 19, 2003, Ms. Walker did not receive another shift to replace the hours she lost because of the conflict. For the week ending September 19, 2003, Ms. Walker refused an alternative shift when it was offered to her. (R. 50, Pl.'s Resp. to Def.'s Facts at 20.) Ms. Walker claims that because of this mis-scheduling, she lost eight hours of pay for the week ending July 19, 2003, and twelve hours of pay for the week ending September 19, 2003.[4] (*Id.* at 11, 17.)

## II. The Events of September 13th

When Ms. Walker reported to work on September 13th, she discovered that she had been mis-scheduled again, this time on September 18th, a day that she was to report to the CFD. Ms. Walker discussed the conflict with Doble, although it is disputed whether Ms. Walker was behaving in an angry and insubordinate manner when she spoke to him. (*Id.* at 23.) Later, Doble called to offer her another shift to which Ms. Walker replied, "Don't worry about it, don't worry

---

[4]GSSC contends that Ms. Walker's original schedule was different from the schedule she had submitted to Doble for the week ending July 19th, but Ms. Walker contends that Doble knew about the changes in her availability days before he created the schedule. (R. 50, Pl.'s Resp. to Def.'s Facts at 17.)

about it" and hung up the phone.[5] (*Id.* at 20.)

Later that day, Alvarez came to Ms. Walker's post. She noticed that Ms. Walker was troubled, and she asked Ms. Walker if something was wrong. It is disputed what Ms. Walker actually said to Alvarez. According to Alvarez, Ms. Walker told her in an angry and insubordinate manner that "she was glad that Captain [Doble] walked out of the building, because she was ready to kill him..." and that she was "sick and tired of him mis-scheduling me...we should just take it outside." (R. __, Def.'s Facts at 7.)[6] According to Ms. Walker's version of the events, she stated that "Doble acts like a — he's just like a little worrisome ass brother. You just want to smack the shit out of him."[7] (R. 46, Def.'s App. to Mot. for Summary J., Pl.'s Dep. at 121.)

Alvarez did not work on the following day, September 14, 2003, but when she reported to work on September 15, she told Doble about her conversation with Ms. Walker and wrote a statement about the incident. (R. 50, Pl.'s Resp. to Def.'s Facts at 26.) D'or suspended Ms. Walker on September 15, 2003. (*Id.* at 27.) On September 17, Ms. Walker attended a meeting with GSSC's director of operations and human resource director, a union representative, and two

---

[5]On September 13, 2005, Ms. Walker filed an internal complaint with GSSC accusing Doble of mis-scheduling her "everytime [sic] something is said that [he] either disagrees with or has a difference of opinion with." (R. 52, Pl.'s App. to Opp. to Summ. J., Walker Dep. Ex. 25.) Ms. Walker further stated that she had been "sexually harassed, named scandalized by [management] to corporate, character assassinated, retaliated against, job threatened by [management] & corporate . . .schedule played with, thereby victimizing me and violating my civil rights." (*Id.*)

[6]This document does not have a record number so it will be identified as R. __.

[7]According to an affidavit submitted to the National Labor Relations Board, Walker stated that she told Alvarez, "I was so mad that I was glad that he left because I was mad enough to hit him." (R. 50, Pl.'s Resp. to Def's Facts at 25.)

Federal Protective Service ("FPS") investigators regarding her alleged threat to Doble. (*Id.* at 29.) At the conclusion of the meeting, the FPS investigators gave Ms. Walker a citation for the threat. At this time, GSSC also decided to terminate Ms. Walker's employment. (*Id.* at 33.) She was officially terminated on September 18, 2005 for the alleged threat and also for her alleged insubordination during the September 13 discussion and subsequent phone conversation with Doble. (*Id.* at 33.) Ms. Walker claims that the mis-schedulings and her termination were in retaliation for her statements at the June 21 meeting about sex discrimination in the BSO program. (R. 49, Pl.'s Resp. to Def.'s Mot. for Summ. J. at 6.) She further claims that GSSC discriminated against her on account of her sex by accommodating the schedules of male Security Officers with outside employment and "rendering more favorable treatment to male Security Officers who were involved in making actual threats against GSSC employees." (R. 1, Pl.'s Compl. at 6.)

## LEGAL STANDARDS

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must "construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party." *King v. Preferred Tech. Group*, 166 F.3d 887, 890 (7th Cir. 1999). Weighing evidence and making credibility decisions are jury functions, resolution of

which is not appropriate for a judge deciding a summary judgment motion. *Anderson*, 477 U.S. at 255. Accordingly, we apply the summary judgment standard with special scrutiny to employment discrimination cases, where issues of intent and credibility often are paramount. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002). Mindful of these standards, we now proceed to examine Ms. Walker's sex discrimination and retaliation claims.

## ANALYSIS

Title VII of the Civil Rights Act of 1964 prohibits employers from treating employees differently on the basis of sex, 42 U.S.C. § 2000e-2(a)(1), and from retaliating against an employee if the employee opposes any practice deemed unlawful under the Act, 42 U.S.C. § 2000e-3(a). Ms. Walker bears the ultimate burden of proving that her employment was adversely affected because of her sex and in retaliation for engaging in protected conduct. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005). She may sustain this burden with either direct or circumstantial evidence of discriminatory intent. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). When there is no direct evidence of discrimination, as is the case here, Ms. Walker can establish both claims under the indirect method of *McDonnell Douglas*.

Ms. Walker can establish a prima facie case of sex discrimination by demonstrating that: "(1) [she] was a member of a protected class; (2) [she] was performing her job satisfactorily; (3) [she] experienced an adverse employment action; and (4) similarly situated individuals were treated more favorably." *Rhodes v. Ill. DOT*, 359 F.3d 498, 504 (7th Cir. 2004). Similarly, Ms. Walker can establish a prima facie case of retaliation by proving that: "(1) after lodging a complaint about discrimination, (2) only [she], and not any otherwise similarly situated employee

7

who did not complain, was (3) subjected to an adverse employment action even though (4) [she] was performing [her] job in a satisfactory manner." *Whittaker*, 424 F.3d at 647 (*citing Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002)). If Ms. Walker establishes a prima facie case of either sex discrimination or retaliation or both, the burden shifts, requiring GSSC to come up with a noninvidious reason for the adverse action. If GSSC cannot satisfy its burden, the Court will deny summary judgment. *Id.* Since the alleged mis-schedulings and subsequent termination encompass both the retaliation and sex discrimination claims, we will resolve each of these issues in turn.

## I. The Alleged Mis-Schedulings

Sections 2000e - 2(a) and 2000e - 3(a) both require that the adverse employment action be material in order to come within the ambit of Title VII. *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005) (noting that "the anti-retaliation rule in § 2000e-3(a) is broader than the anti-discrimination rule in § 2000e-2(a) in the sense that it extends beyond pay and other tangible employment actions, [but] nothing in § 2000e-3(a) says or even hints that the significance or materiality requirement has been dispensed with . . ."). An action is material if it would have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Id.* at 662. "Typically, adverse employment actions are economic injuries such as dismissal, suspension, failure to promote, or diminution in pay." *Markel v. Bd. of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002).

Ms. Walker alleges that she was intentionally mis-scheduled by Doble, causing both inconvenience and loss pay. She further claims that other male security officers with outside employment had their known schedules accommodated without encountering the same type of

8

conflicts. The evidence, viewed in the light most favorable to Ms. Walker, establishes that she did not suffer an adverse employment action. For three of the five instances of mis-scheduling alleged by Ms. Walker, she was replaced on the schedule without any disciplinary actions taken against her. Furthermore, she was allowed to work another shift so that she did not lose any time as a result of the mis-scheduling. Ms. Walker contends that the each time she had to contest her schedule, it was "a hassle as management would have to change someone else's schedule . . . [which] brought plaintiff into conflict with other officers who often resented a change in their schedules." (R. 50, Pl.'s Resp. to Def.'s Facts at 10.) Absent any financial or other significant consequences, this factor by itself likely would not dissuade a reasonable worker from making or supporting a charge of discrimination nor does it constitute a material change in Ms. Walker's employment status. *See Washington*, 420 F.3d at 661 (stating that some employment changes "may cause upset as workers must adjust their schedules but [these changes] do not hurt the pocketbook" and "normally are not 'adverse employment actions'").

There are, however, two incidents in which Ms. Walker alleges financial harm. First, she claims that she lost eight hours of pay for the week ending July 19, 2003 because the conflicting shift was not replaced. While we sympathize with Ms. Walker's position, this is not material within the meaning of Section 2000e-(b)(3). "The adverse action must materially alter the terms and conditions of employment." *Stutler v. Ill. Dept. of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001). A full time employee at GSSC works a minimum of 32 hours. Ms. Walker received 35 hours of pay for the week ending July 19, 2003. (R. 50, Pl.'s Resp. to Def.'s Facts at 14-15.)

Furthermore, Ms. Walker worked 181 hours for the month of July 2003 whereas the average hours worked among guards on the Loop contract was 159. (*Id.* at 13.) The terms and

conditions of Ms. Walker's employment were not altered by a loss of eight hours of pay, when in fact she still worked enough hours to qualify as full time and exceeded the monthly average of hours worked by Loop guards. *Washington*, 420 F.3d at 661 (stating that a tangible employment action must be "significant" in order to qualify as discrimination so that "life's little reverses are not causes of litigation").

Second, Ms. Walker alleges that she lost 12 hours of pay for the week ending September 19, 2003. This does not constitute an adverse employment action because Doble offered to replace the conflicting shift, which Ms. Walker refused. Furthermore, Ms. Walker was suspended on September 16th and officially terminated on September 18, 2003. Any financial harm that may have occurred as a result of the conflicting September 18th shift became moot since Ms. Walker was no longer an employee. *See Whittaker*, 424 F.3d at 647 (*citing Stavropoulos v. Firestone*, 361 F.3d 610, 617 (11th Cir. 2004) ("An action which, it turns out, had no effect on an employee is not an 'adverse action.'")). Because Ms. Walker cannot establish that she suffered an adverse employment action, we need not reach the other prongs of

the analysis.[8]

## II. Ms. Walker's Termination

Ms. Walker's claims also fail because GSSC has demonstrated a legitimate non-discriminatory reason for her dismissal which Ms. Walker cannot contradict. GSSC terminated Ms. Walker for her threatening and insubordinate action towards Doble. The Seventh Circuit has noted that "insubordination is a legitimate, nondiscriminatory reason for firing an employee." *Flores v. Preferred Tech. Group*, 182 F.3d 512, 515 (7th Cir. 1999); *see also Bean v. Wis. Bell*, 366 F.3d 451, 453 (7th Cir. 2004) ("An employer is likely to treat insubordination more harshly than most other forms of employee misconduct . . . because of the threat to workplace discipline.").

The GSSC Personnel Policy manual states that certain conduct will lead to discipline and

---

[8]Had we reached the other prongs of the analysis, it is unlikely that Ms. Walker would have been able to prove that similarly situated employees were treated more favorably. Specifically, Ms. Walker claims that Doble did not mis-schedule other fire department personnel, but she does not provide any evidence of this fact. (R. 49, Pl.'s Resp. to Def.'s Mot. for Summ. J. at 10.) Ms. Walker further alleges that other male security guards who made threats against co-workers or supervisors were not terminated from their position at GSSC. In fact, GSSC identified two other instances in which officers, both of whom had never made any complaints of discrimination, were terminated for making direct or overt threats against management. Ms. Walker claims that her statement was non-threatening so it can be distinguished from the situations involving the male officers. (R.50, Pl.'s Resp. to Def.'s Facts at 35.)

In fact, her statement that she was glad Doble had left because "she was mad enough to hit him" or in the alternative "smack the shit out of him" is comparable to a situation where a male security officer was terminated for telling another guard "what comes around goes around" and "you better watch your back." (*Id.* at 27-28.) Even if neither comment is considered a direct threat to hurt or kill someone, both comments can certainly be perceived as rude, insubordinate, and more importantly, ominous. Functionally, there is no difference between what Ms. Walker said and what the other male employee who was terminated said. Similar to other male officers who made threatening or abusive comments to other GSSC employees, Ms. Walker was terminated for conduct that, at the very least, can be categorized as insubordinate.

in some cases, immediate discharge including:

> 1. [D]isorderly conduct, including using abusive or offensive language, quarreling, intimidating by words or actions, fighting or participating in disruptive activities that interfere with the operation of the client or Company; 2. Failing to maintain a respectful and helpful attitude in all work endeavors; and being insubordinate.

(R. 50, Pl.'s Resp. to Def.'s Facts at 27-28.) Following the alleged threat, Ms. Walker was interviewed by GSSC management and FPS. At the conclusion of the meeting, both GSSC and FPS determined that the threat was credible and violated company policy. FPS gave Ms. Walker a citation and refused to allow her to stay in the building. GSSC also terminated her employment. (*Id.* at 30.)

Because GSSC has articulated a legitimate, nondiscriminatory reason for Ms. Walker's dismissal, the burden then shifts to Ms. Walker to prove that GSSC's purported reason for her termination is pretextual. *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 920 (7th Cir. 2001). Pretext is "a lie, specifically a phony reason for an action." *Id.* "Pretext may be established directly by showing that the employer 'was more likely than not motivated by a discriminatory reason,' or indirectly by presenting evidence that the 'employer's explanation is not credible.'" *Id.* at 920 (*citing Jackson v. E.J. Brach Corp.*, 176 F.3d at 984 (citations omitted)). If there is no direct evidence of pretext, as is the case here, Ms. Walker may show pretext indirectly by presenting evidence that "(1) defendant's explanation for the adverse job action had no basis in fact; (2) the explanation was not the 'real' reason for the adverse job action; or (3) the reason given was insufficient to warrant the adverse job action. *Id.*

Ms. Walker argues that Alvarez laughed when she made the comment about Doble, undermining the idea that Ms. Walker threatened Doble. (R. 49, Pl.'s Resp. to Def.'s Mot. for

12

Summ. J. at 11.) Ms. Walker further claims that had Alvarez considered her statement a legitimate threat, Alvarez would have relieved Ms. Walker of her post, her duties or her weapon on that day or the next. (*Id.*) Regardless if Ms. Walker's statement is considered a direct threat or not, Ms. Walker admits that she said she wanted to "smack the shit" out of Doble and that he acts like "a worrisome ass little brother." (R. 50, Pl.'s Resp. to Def.'s Facts at 25.) GSSC certainly could find these comments threatening, or at the very least, insubordinate and offensive. Ms. Walker has not presented any evidence that her discharge was pretextual because she did, in fact, make offensive comments, and it is not our position to second-guess GSSC's legitimate, non-discriminatory decision to terminate her employment. *See Logan*, 246 F.3d at 921 ("When an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.").

## CONCLUSION

Drawing all inferences in favor of Ms. Walker, the record does not allow us to conclude that she has established that there is a genuine issue of material fact requiring resolution at a trial. She has not established a prima facie case of sex discrimination or for retaliation. For these reasons, we grant GSSC's motion for summary judgment in its entirety (R. 42-1) and dismiss its motion to strike as moot (R. 53-1).

ENTERED:

Judge Ruben Castillo

United States District Court

Dated: December 12, 2005